UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHELLE BARD<br>Plaintiff<br><br>v.<br><br>MARK STEVEN CVS, INC.,<br>CONSUMER VALUE STORES of<br>RHODE ISLAND, INC. and<br>CVS, INC.<br>Defendants | ) | C.A. No.: 03-355L |

DECISION AND ORDER

Ronald R. Lagueux, Senior United States District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment on all five Counts in Plaintiff's Complaint. Plaintiff charges that Defendants, her former employer, unfairly discriminated against her because of her gender and in retaliation for her exercise of protected behavior, in contravention of federal and state law.

Plaintiff alleges discriminatory denial of promotion and constructive discharge. These allegations form the basis of all her causes of action and, if proven, constitute a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Count I), its state counterpart, the Rhode Island Fair Employment Practices Act ("RIFEPA"), R.I. Gen. Laws § 28-5-1 (Count II), and the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1 (Count IV). Bard also alleges that the Defendants' conduct represents a violation of the federal anti-

discrimination protection codified in 42 U.S.C. § 1981 (Count III). However, this statute does not provide a remedy for discrimination based on sex. Plaintiff also alleges that Defendants' conduct constituted the torts of negligent hiring, negligent supervision, and intentional infliction of emotional distress (Count V).

After consideration of the evidence submitted by the parties and a review of the relevant law, this Court concludes that summary judgment should be granted in favor of Defendants on all five Counts of Plaintiff's Complaint.

**Background**

Michelle Bard (hereinafter "Bard" or "Plaintiff") graduated with honors from Woonsocket Senior High School in 1979 and received a certificate in architectural drafting from the Hall Institute in 1987. She began her employment as a draftsperson at Consumer Value Stores of Rhode Island (hereinafter "CVS"),[1] in February 1988. CVS is a retail pharmacy chain, headquartered in Woonsocket, Rhode Island, with more than 5,000 stores in thirty-six states.

The following year, in September 1989, Bard resigned from her employment, but was rehired at CVS later that month, by Human Resources Employee Manager Joanne Borden, to a clerical position

[1] Defendants Mark Stevens, Inc., Consumer Value Stores of Rhode Island, Inc., and CVS, Inc. are referred to jointly as "CVS."

in the human resources department. Approximately one month later, Dick Mathieu, CVS' Director of Construction Services, offered Plaintiff the opportunity to return to the drafting department at Pay Grade 7, which she accepted. By 1991, Mathieu promoted Bard to Systems Production Coordinator, accompanied by a substantial pay raise to Pay Grade 23. Her next position was CADD Specifications Coordinator which she assumed in late 1992 or early 1993. Bard remained in the drafting department from 1989 until her departure from CVS, in early December 1996.

In approximately April 1992, Plaintiff's supervisor, Steve Phillips, began to make advances towards her, which she believed constituted sexual harassment. Later that year she informed Phillip's colleague, Mike Reilly, about Phillip's unwanted conduct towards her, in hopes that he would intervene. At the time, Plaintiff did not want "to make a big case out of it" by lodging a formal complaint with the human resources department.

Phillips continued to engage in the unwelcome conduct and on September 15, 1993, Plaintiff complained to Borden in the human resources department, who began an investigation the same day. Several days later, Borden informed Bard that Phillips was no longer working at CVS. Plaintiff was satisfied with the promptness of CVS' response and the fact that she was never harassed at work again by Phillips after her complaint to Borden.

In January 1994, CVS hired George Staples as Architectural

Systems Manager, to be one of Plaintiff's supervisors in the drafting department. Plaintiff soon felt that Staples had little interest in her work. She later stated that she believed his disinterest was in retaliation for her 1993 complaint about Phillips. However, Plaintiff acknowledged in her deposition that her belief was speculative and that it was unlikely that Staples knew Phillips, as they did not work at CVS at the same time.

A number of events occurred over the next several months that caused Director of Construction Services Mathieu to question Bard's ability to serve in a leadership or management role in the department. For example, on one occasion, Plaintiff apparently became angry with her secretary, and left her a profanity-laced voice mail message. On another occasion, a card was circulated around the drafting department, for a resigning CVS employee. Despite the fact that the card would be seen by co-workers, Plaintiff wrote that CVS was forcing her out as well, implying that the resigning employee, too, had been forced out.

Plaintiff began a romantic relationship with her immediate supervisor, John Tellier, in 1995. On a weekend in mid-1996, Tellier and a number of others, including CVS employee Samantha Robertson, were at a house party where Plaintiff observed Robertson flirting with Tellier. The next day, Bard went to work on her day off and confronted Robertson. In a raised voice, Bard swore at Robertson and warned her to stay away from Tellier,

.obertson to demand that Plaintiff leave her office. ɜ confrontation, Bard went home and telephoned the vice- t of the department to apologize, acknowledging her

a result of CVS' business needs, driven mainly by an ;e in the number of its stores, Mathieu reorganized the ng department in September 1996. The reorganization ıed creating a new management position within the ɛment, laterally moving personnel, and adding new hires.

Stephens was promoted from the position of Systems Analyst the new management position. At the time, Bard believed thā should have been selected for this position.[2] As Mathieu .ained in his affidavit, he decided Stephens was a better didate for this position than Plaintiff because: (1) he had ;ociates Degree in Civil Engineering, as compared to Plainti ɔ had a certificate in drafting, (2) because Stephens had ;arly ten years more experience in drafting and designing th ıd Plaintiff, (3) because Stephens received a better annual eview in 1995 than did Plaintiff, and (4) because he was de ːo be better suited to lead and manage others, inasmuch as h not engaged in inappropriate conduct directed towards other

[2] Bard had submitted a departmental personnel reorgani proposal to Staples in March 1995, in which she had placed herself in this management role.

the department, as had Plaintiff.

The drafting department's reorganization involved a number of personnel moves, including a move for Plaintiff, who was transferred to the Systems Analyst position that Stephens held prior to the reorganization. She has alleged this was a demotion, because when Stephens was a Systems Analyst, he was paid at Pay Grade 24 and she remained at Pay Grade 23, despite taking over his job. However, in the Fall of 1996, Borden explained to Plaintiff that CVS' pay grades overlap, such that it is possible that an employee at a lower pay grade could earn a salary equal to or higher than an employee at a higher pay grade. Indeed, Plaintiff's Pay Grade 23 salary was $36,671, nearly 10% higher than Stephens' Systems Analyst Pay Grade 24 salary of $33,411. Additionally, even after Stephens was promoted to the new management position, his annual salary at Pay Grade 26 was $36,753, only $82 higher than Plaintiff's salary.

After the reorganization, Mathieu's doubts about Plaintiff's management potential were confirmed by additional incidences of inappropriate workplace conduct. For example, in early October 1996, she sent an email to Staples, which upper management considered sarcastic and insubordinate. On another occasion, Bard pressured a co-worker to show her an email he received and when he resisted, she grabbed the computer mouse from his hand and printed out a copy of the email herself.

At around this time, Bard took a two-week leave of absence. Upon her return later in October 1996, she complained to Borden about not receiving the management position, asserting her belief that she had been discriminated against because of her gender. Staples had also reported to Borden about Plaintiff's insubordinate behavior. Thus, at the request of both Plaintiff and Staples, Borden began an investigation. She also referred Bard to CVS' Employee Assistance Program, but Bard declined to participate.

At the conclusion of her investigation, Borden explained to Plaintiff that she found no evidence of discrimination, because Plaintiff's salary was within CVS' guidelines, in fact higher than Stephens' salary had been when he served in the same position, and because Plaintiff's own disruptive behavior in the workplace had interfered with her ability to advance to a leadership role.

Bard did not accept Borden's findings and continued to believe that she should have received the management promotion. Borden was concerned with Plaintiff's reaction and proposed the creation of an action plan to assist Plaintiff in improving her performance. Borden also told Bard that if she continued to feel unhappy at CVS, the company would consider offering her a severance package. Bard has asserted that Mathieu encouraged her to resign and accept a severance package, while informing her

that she would be terminated if she deviated even slightly from company expectations. At this point, Bard began consulting with an attorney about her work situation and the severance package. In October 1996, she filled out a discrimination questionnaire with the Rhode Island Commission for Human Rights ("RICHR") accusing CVS of gender discrimination. Filing a questionnaire with the Commission is the first step in pursuing a legal claim of discrimination.

In further detailed discussions about the severance package, Borden explained to Plaintiff the benefits which she would receive, including seventeen weeks of salary continuation, health insurance coverage, and outplacement services. CVS further offered to make her separation effective January 4, 1997, thus continuing active employment benefits through December 31, 1996, while not requiring her to work past December 6, 1996. On the advice of her attorney, Plaintiff requested, and Borden agreed, that she would remain eligible for payout of her annual bonus, as well as unused vacation and sick pay. Borden informed Plaintiff that a letter of resignation was required before she could obtain a copy of the severance agreement.

On December 9, 1996, Plaintiff brought a letter of resignation to her meeting with Borden. Borden gave her a copy of the severance agreement, which was an eleven-point, four-page document entitled "Agreement and General Release" (hereinafter

"Agreement"). In addition to detailing the benefits offered to Bard, the Agreement contained a release, clearly stating that Plaintiff forever discharged CVS from all claims resulting from "any federal, state, or local law or regulation relating to discrimination, including, but not limited to ... the Civil Rights Act of 1964, Title VII...." The Agreement further stated in bold print that "Employee is advised to consult with an attorney prior to signing this Agreement and General Release" and that "Employee has twenty-one (21) days (until 01-25-97) to review and consider this Agreement and General Release." In fact, Plaintiff had more than forty-five days to sign the Agreement, until January 25, 1997, which was twenty-one days from the post-dated January 4, 1997, separation date. Borden read the entire document aloud to Plaintiff, who stated that she understood the Agreement.

Although Bard was allowed more than three weeks to review the Agreement with her lawyer, she chose to sign it in Borden's office, writing "under protest" beneath her signature on the document. Borden informed Plaintiff that she could not accept her signature if it was "under protest" and printed a fresh copy of the Agreement for Plaintiff. Borden further reminded her that she had twenty-one days in which to examine the document. However, because Bard wanted to begin receiving the severance benefits immediately, she signed the Agreement, without availing herself

of the review period.

After leaving CVS in early December 1996, Bard received all the benefits promised by CVS in the severance Agreement. Nine days after the benefits expired, she filed a formal charge of gender discrimination with the Equal Employment Opportunity Commission ("EEOC") and the RICHR on June 10, 1997. In her charge, Plaintiff alleged that she was denied promotion and demoted on September 16, 1996. On August 21, 2003, Bard filed this lawsuit in this Court.

## Analysis

## Jurisdiction and Summary Judgment Standard of Review

### A. Jurisdiction

Plaintiff filed this action under 42 U.S.C. § 2000e-5(f) and under 28 U.S.C. §§ 1331, 1343, 2201, and 2202. Consequently, there is federal subject matter jurisdiction. Furthermore, a district court's original jurisdiction over federal questions enables the court to consider state law claims in conjunction with federal claims when they "derive from a common nucleus of operative fact" such that the entire action is but one case. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966); See also, 28 U.S.C. § 1367(a) (providing that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action ...

that they form part of the same case or controversy. Id. Since the state law statutory and tort claims are intertwined with the federal claims asserted under Title VII and § 1981, because they arise from common factual allegations, the Court will exercise jurisdiction over all the claims set forth in the five Counts of the Complaint.

**B. Summary Judgment Standard of Review**

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. Continental Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). Federal Rule of Civil Procedure 56(c) requires that summary judgment be granted if there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. A material fact is one affecting the lawsuit's outcome. URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1279 (D.R.I. 1996). Factual disputes are genuine when, based on the evidence presented, a reasonable trier of fact could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To win summary judgment on a particular count of the complaint, the moving party must show that "there is an absence of evidence to support" the nonmoving party's claim. Celotex

(1986). In response, t

...oving party cannot rest on his or her pleadings, but m "set forth specific facts demonstrating that there is a ge issue for trial" as to the claim that is the subject of the summary judgment motion. Oliver v. Digital Equip. Corp., 84 103, 105 (1st Cir. 1988).

Although the Court may not grant summary judgment simpl because the facts offered by the moving party appear to be m credible, when a plaintiff fails to provide the Court with a Statement of Disputed Material Facts as required by Local Rul 12.1, the Court accepts as true the facts provided by defenda in its Statement of Undisputed Facts accompanying its motion f summary judgment. D'Oliviera v. Rare Hospitality Int'l Inc., 1 F. Supp. 2d 346, 349 (D.R.I. 2001). Local Rule 12.1 provides th "[a]ny party opposing a motion [for summary judgment] shall ser and file, together with the opposing memorandum of law required under Rule 12 of these Rules, a concise statement of all materia facts as to which he contends there is a genuine issue necessary to be litigated." D.R.I.R. 12.1(a)(2). Moreover, in deciding a motion for summary judgment:

> the court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by affidavit filed in opposition to the motion, or by other evidentiary materials which the court may consider under Rule 56 of the Federal Rules of Civil Procedure.

D.R.I. LR 12.1(d).

The First Circuit has repeatedly warned that "noncompliance with ... [a local rule], as manifested by a failure to present a statement of *disputed* facts ... justifies the court's deeming the facts presented in the movant's statement of *undisputed* facts admitted...." (Emphasis added). Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000); Accord Desrosiers v. Hartford Life & Accident Ins. Co., 354 F. Supp. 2d 119, 123-24 (D.R.I. 2005); Harvey v. Snow, 281 F. Supp. 2d 376, 383 (D.R.I. 2003); Hazard v. S. Union Co., 275 F. Supp. 2d 214, 222-23 (D.R.I. 2003). As the First Circuit noted in Rivera, federal courts are concerned that, "absent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the 'specter of district court judges being unfairly sandbagged by unadvertised factual issues.'" 209 F.3d at 28 (quoting Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 931 (1st Cir. 1983)). Since the local rules provide a structured framework for the summary judgment process, parties ignore the rules at their own peril. Id.

In Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, she states "Plaintiff incorporates her Affidavit and Exhibits 1-17 as well as portions of Defendant's [sic] Exhibit 1 which are the transcripts of Michelle's deposition herein, as her *undisputed* statement of

cts pursuant to Local Rule 12.1." (Emphasis added.)

the statement of facts is undisputed, it follows that there e no genuine factual issues to be litigated and the matter is pe for summary judgment. Furthermore, Plaintiff's factual ffering fails to assist the Court in identifying any material act about which there is a genuine dispute.

Additionally, Plaintiff's incorporated statement of facts ncludes inconsistencies and contradictions. For example, on critical issues of whether Plaintiff understood the Agreement and had a reasonable period of time to review it before signing, her Affidavit directly contradicts her deposition admissions, included in Defendants' Exhibit A. When Plaintiff was asked at her deposition if there was anything about the release that she did not understand, she replied that "I can't say I didn't understand anything." Likewise, Plaintiff admitted that Borden repeatedly told her that she had twenty-one days to review the document. Yet, she claims in her affidavit that she "never fully understood or comprehended" or "had an opportunity to fully read and comprehend its terms or the waiver of [her] rights before [she] signed it." A party cannot create a genuine issue of material fact to defeat summary judgment by submitting an affidavit which contradicts her own previous deposition testimony. Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001) ("We have refused to allow issues of fact to be created

simply by submitting a subsequent contradictory affidavit."); Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

In the present case, Plaintiff failed to provide the Court with a Statement of Disputed Facts as required by Local Rule 12.1. Accordingly, the Court accepts the facts as delineated by Defendants in their Statement of Undisputed Facts.

**Causes of Action**

All of Plaintiff's causes of action stem from common allegations related to sex discrimination and retaliation by CVS. Plaintiff brought her five-count Complaint under two federal anti-discrimination statutes, Title VII of the Civil Rights Act of 1964 and § 1981, two state anti-discrimination statutes, the Rhode Island Fair Employment Practices Act ("RIFEPA") and the Rhode Island Civil Rights Act of 1990 ("RICRA"), as well as state tort claims. As previously noted, because § 1981 does not provide a remedy for sex discrimination, Plaintiff's claim is not cognizable under this statute. See Runyon v. McCrary, 427 U.S. 160, 167 (1976).

Title VII of the Civil Rights Act proscribes employment

discrimination on the basis of race, sex, and national origin. The Rhode Island Fair Employment Practices Act is nearly identical in its remedial provisions and also prohibits discrimination based on sex in the workplace. The Rhode Island Supreme Court has applied the same analytical framework developed for Title VII cases to actions under RIFEPA. Marley v. United Parcel Service, Inc., 665 F. Supp. 119, 128 (D.R.I. 1987). The Rhode Island Civil Rights Act mandates that "all persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have ... the same rights ... [and] the full and equal benefit of all the laws." R.I. Gen. Laws 42-112-1. The Rhode Island Supreme Court as well as this Court have held that RICRA extends to all forms of discrimination in the workplace. Ward v. City of Pawtucket Police Dep't, 639 A.2d 1379, 1381 (R.I. 1994); See also Iacampo v. Hasbro, Inc., 929 F. Supp. 562, 573 (D.R.I. 1996).

In Count V, Plaintiff alleges that Defendants have committed the state common law torts of negligent hiring, negligent supervision, and intentional infliction of emotional distress.

**Waiver of Plaintiff's Claims**

When Plaintiff resigned from her employment at CVS, she signed an Agreement which included, *inter alia*, a waiver of all

Agreement binding on Plaintiff. If the release Agreement is valid, Plaintiff has waived all the statutory and tort claims set forth in the Complaint, and summary judgment for Defendants is appropriate.

In employment discrimination cases, courts have long "upheld releases given in exchange for additional benefits." Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 11 (1st Cir. 1997); Melanson v. Browning-Ferris Indus., Inc., 281 F.3d 272, 274 (1st Cir. 2002) (concluding that Title VII waivers are governed by the same principles as apply to other federal statutory claims). As the First Circuit explained, "such releases provide a means of voluntary resolution of potential and actual legal disputes, and mete out a type of industrial justice." Rivera-Flores, 112 F.3d at 11. Indeed, Title VII clearly encourages private resolution of employment disputes by requiring that the EEOC utilize conciliation efforts to settle disputes informally. Id. at 12; 42 U.S.C. § 2000e-5(b).

The employer, in this case CVS, bears the burden to plead and prove the affirmative defenses of waiver and release. See Fed. R. Civ. P. 8(c); Melanson, 281 F.3d at 276. An enforceable waiver and release must be knowing and voluntary, as evidenced by the "totality of the circumstances." Melanson, 281 F.3d at 276; Rivera-Flores, 112 F.3d at 10. Therefore, in order for this Court to dispose of Plaintiff's claims on summary judgment, Defendants

must present undisputed facts establishing that Plaintiff knowingly and voluntarily waived her rights to bring suit against CVS. See Celotex, 477 U.S. at 325.

**A. The Six-Factor Totality of the Circumstances Test**

The First Circuit has found six factors helpful in performing a totality of the circumstances test to determine if a waiver of rights is knowing and voluntary in the employment context: (1) plaintiff's education; (2) the respective roles of the employer and employee in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent counsel; and (6) the consideration for the waiver. Rivera-Flores, 112 F.3d at 12. These factors are non-exclusive and it is not necessary that each be satisfied for the waiver to be enforced. Rather, "[t]he essential question is whether, in the totality of the circumstances, the individual's waiver of her right can be characterized as 'knowing and voluntary.'" Melanson, 281 F.3d at 276.

The first factor is Bard's education and business experience. Because Plaintiff's substantive claims result from the denial of a promotion to a managerial position in CVS' drafting department, for which she alleges she was the best

deposition that she understood the entire severance package before signing. Therefore, the first of the six factors clearly supports the enforcement of the Agreement.

Second, this Court considers the respective roles of the employer and employee in determining the provisions of the waiver. Bard first consulted an attorney about her employment and the severance package prior to her resignation. She and Borden discussed the provisions of the Agreement and, on the advice of her attorney, Bard requested and received additional benefits. In fact, CVS agreed to every modification to the original severance Agreement which Plaintiff requested. Thus, Bard's substantial role in negotiating her General Agreement and Release with CVS favors the enforcement of the waiver.

In considering the third factor, the clarity of the Agreement, Plaintiff's admission in her deposition testimony that she understood the document, is dispositive. Even if Bard had not admitted her understanding, the Court determines that the Agreement is clear on its face. It was drafted in plain language, and is comparable to the language of the release approved by the First Circuit in <u>Melanson</u>, 281 F.3d at 277. The Agreement provided that Bard "does hereby remise, release and forever discharge" CVS "from all manner of actions," including

covered all claims for violation of any federal, state or local law relating to discrimination. Borden read the entire Agreement aloud to Plaintiff, who acknowledged that she completely understood it. Thus, there is no issue concerning the clarity of the Agreement.

The fourth factor which this Court examines in evaluating the validity of the waiver is whether the twenty-one day review period was adequate. Bard was aware of the review period; she acknowledged that Borden reminded and in fact encouraged her to take advantage of the time allowed to review the Agreement with her attorney before signing. The Agreement itself spelled out in bold print that she had twenty-one days to consider the severance package before accepting it. Furthermore, because the effective termination was post-dated, the Agreement actually allowed Plaintiff until January 25, 1997, to sign, which was over forty-five days from her resignation and receipt of the written copy of the Agreement on December 9, 1996. Plaintiff declined to avail herself of the review period because she wanted to take advantage of the severance benefits immediately. Clearly, there is no issue of material fact with regard to the adequacy of the time Plaintiff had to review the Agreement with her attorney.

Considering the fifth factor, this Court holds that there is

consulted with an attorney prior to submitting her resignation letter on December 9, 1996, and it was on the advice of counsel that she negotiated the additional forms of consideration that were ultimately included in the Agreement.

The last factor which this Court weighs, the consideration provided by the Agreement, also militates in favor of enforcement of the waiver. It is undisputed that Plaintiff had no legal entitlement to any benefits upon termination of her employment with CVS. The Agreement stated that Plaintiff would receive no monies or other benefits unless she executed the Agreement. Borden explained to Plaintiff that she would receive severance benefits only by signing the Agreement. The consideration for the Agreement was significant and Plaintiff received and accepted each of the severance benefits provided by CVS.[3] There is no genuine issue of material fact as to the consideration offered and accepted by Plaintiff in exchange for waiver of her rights to bring suit against Defendants.

Therefore, in the case at bar, considering the totality of the circumstances this Court holds that Plaintiff was an intelligent and experienced employee, who after consulting with an attorney, negotiated with CVS for more favorable terms to the

severance Agreement offered. The Agreement was written in plain language, and open for at least twenty-one days for her review. Furthermore, under this contract she would receive substantial benefits, to which she would not be entitled unless she agreed to the waiver. Thus, all six factors strongly weigh in favor of enforcing the Agreement as a waiver of Plaintiff's rights to sue CVS over issues relating to her employment.

**B. Plaintiff's Knowledge of Her Rights**

While the First Circuit has endorsed the set of six factors as a tool in examining the totality of the circumstances surrounding the execution of a release, the Court is not limited to considering only these six factors. Melanson, 281 F.2d at 276. This Court has also emphasized that "[a] party cannot waive such a right unless he or she does so knowingly, that is with knowledge of the facts." Harvard Pilgrim Health Care of New England v. Thompson, 318 F. Supp. 2d 1, 11 (D.R.I. 2004); Doyle v. Huntress, Inc., 301 F. Supp. 2d 135, 149 (D.R.I. 2004).

Bard signed the waiver of her rights to sue CVS, knowing that she had a potential legal claim against her former employer. She agreed to the waiver in exchange for benefits no less than two months *after* she concluded that she was discriminated against, consulted with a lawyer, and filed an initial

full knowledge and understanding of the facts.

**Duress**

Finally, Plaintiff claims duress. She contends that even if the waiver is valid, she had no choice but to sign the Agreement, because as a single mother of two children she could not afford to be without income.

It is well settled that "[a] contract or release, the execution of which is induced by duress, is voidable, not void, and the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989) (quoting Di Rose v. PK Mgmt. Corp., 691 F.2d 628, 633-34 (2nd Cir. 1982)). Therefore, before Plaintiff's claim of duress may be considered, the Court must first determine if Bard has preserved her right to make this claim.

If the party claiming duress does not repugn the agreement within a reasonable period of time, the waiver allegedly executed under duress will be considered ratified or affirmed. In re Boston Shipyard Corp., 886 F.2d at 455; See Teamsters Local No. 25 v. Penn Transp. Corp., 359 F. Supp. 344, 349 (D. Mass. 1973). An agreement may be ratified in numerous ways: for example, intentionally accepting benefits under the agreement; by

agreement by acting upon it or affirmatively acknowledging it. In re Boston Shipyard Corp., 886 F.2d at 455 (citing United States v. McBride, 571 F. Supp. 596, 613 (S.D. Tex. 1983)).

The undisputed facts indicate that Plaintiff ratified the severance Agreement and thereby waived her claim of economic duress. For nearly six months after signing the Agreement, she accepted the weekly salary continuation paychecks; she accepted the bonus payout in April 1997; she remained covered by CVS' health insurance benefit; and she utilized the outplacement services provided by CVS. Not once during this period of time did Plaintiff attempt to repudiate the Agreement or decline to accept the benefits it provided. Only after she received every possible benefit did she act inconsistently with the Agreement by filing her formal charge of discrimination with RICHR on June 10, 1997.

Furthermore, even if Plaintiff had promptly repudiated the Agreement, it is widely recognized that this kind of duress, however upsetting to the individual involved, does not rise to the level of legal duress, making an agreement voidable. See Nicholas v. NYNEX, Inc., 929 F. Supp. 727, 732-33 (S.D.N.Y. 1996) (noting that while choice between accepting enhanced severance benefits or retaining the right to sue an employer is difficult in light of uncertainties of unemployment and resulting financial

economic pressure is always present when someone is offered a large sum of money for a release, and this pressure does not constitute duress sufficient to avoid waiver); EEOC v. Am. Express Publ'g Corp., 681 F. Supp. 216, 219 (S.D.N.Y. 1988) ("[T]he fact that a party faces a difficult choice—between additional benefits or pursuing his legal rights—does not alone indicate lack of free will."). Clearly, Plaintiff's economic duress argument has no merit in this case.

**Conclusion**

Viewing the evidence in the light most favorable to Plaintiff, this Court concludes that she knowingly and voluntarily released her claims against CVS in exchange for a substantial severance package; she cannot avoid the release because of alleged duress; and the release bars all her federal and state claims, whether statutory or in tort. For the forgoing reasons, Defendants' Motion for Summary Judgment is granted as to Counts I, II, IV, and V of Plaintiff's Complaint. Because Plaintiff's claims of sex discrimination are not cognizable under § 1981, Count III is dismissed. The Clerk shall enter judgment for Defendants, forthwith, on all five Counts of the Complaint.

It is so ordered.

Ronald R. Lagueux
Senior United States District Judge
July 15, 2005